[Crim. No. 3443.   Second Dist., Div. One.—April 25, 1941.]

THE PEOPLE, Respondent, v. WILLIAM HANNON et al., Appellants.

Gladys Towles Root for Appellants.

Earl Warren, Attorney-General, and R. S. McLaughlin, Deputy Attorney-General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, appellants and one Thaddeus F. Fuller were accused of three counts of rape, one count of robbery, and one count of kidnaping for the purpose of robbery. Following not guilty pleas by all defendants to all counts and a jury trial, the two appellants herein were found guilty on two counts of rape and not guilty of the crimes of robbery and kidnaping, while during the progress of the trial the third count of rape was dismissed as to all defendants. Defendant Fuller was acquitted on all counts. From the two judgments of conviction and from an order denying their motion for a new trial, appellants prosecute this appeal.

Stating the facts in the light most favorable to the prosecution, as we are required to do following a guilty verdict, the record discloses that on the night of July 20, 1940, Maurice H. Stevens, Jr., and his wife entered a cafe in southeast Los Angeles conducted and in the main patronized by persons of the colored race. During their stay in the cafe Mr. and Mrs. Stevens each consumed three bottles of beer. They were the

only white persons present during the evening, and they spent the time talking to each other and also in conversation with other patrons, as well as operating the nickle-in-the-slot phonograph machine.

About 12:15 o'clock Sunday morning, Mr. and Mrs. Stevens left the cafe, walked to the curb and entered their automobile. As they started to drive away they discovered that they had a flat tire and were without tools with which to change tires. Mr. Stevens alighted from the car, and about that time appellant Hannon, who had followed Mr. and Mrs. Stevens out of the cafe, inquired if he could be of assistance. Mr. Stevens explained they had no tools, and appellant Hannon told him if he would drive around the corner to Hannon's car, the latter had the necessary equipment and would help change the tire. According to the testimony of Mr. and Mrs. Stevens, at that time they believed they were alone in the car. Appellant Hannon stepped onto the running board next to Mrs. Stevens and directed them to ''just drive around the corner here''. As they approached the corner of Wilmington and Imperial Boulevard, according to the testimony of Mr. Stevens, ''somebody popped up from the back seat—I don't know where they came from—and held a sharp—or held this instrument to my back and told me to keep on driving''. Mr. Stevens was unable to state whether the instrument was a knife, a gun, or just a piece of steel. In obedience to the voice directing him to ''just keep on driving, white boy'', Stevens continued to drive until they had passed Grape Street on 115th, when he stopped his car and the voice said, ''O.K.'' The evidence indicates there were no houses on 115th Street east of Grape at or near the place where the car was stopped.

As soon as the car stopped, appellant Hannon stepped off the running board, opened the front door of the car next to Mrs. Stevens, grabbed her round the neck and dragged her backwards out of the car and into an adjoining vacant lot. Mr. Stevens also alighted from the car and ''rushed across the vacant lot''. After he had gone 50 or 75 feet into the lot he saw four or five colored men near his wife and one of them had her down on the ground. As he approached this group, one of the men, testified to as being about appellant Anderson's build, hit Stevens over the eye and knocked him down. Each time he attempted to rise he was struck in

the eyes, nose or mouth until he lost consciousness. He observed one of the colored men having sexual intercourse with his wife. There is evidence in the record that after appellant Hannon dragged Mrs. Stevens across the stubble in the vacant lot, holding her by the throat, he tripped her and attacked her. When she became aware of Hannon's intentions, she screamed. At this point one of the group held a long knife close to her throat and threatened to "cut your husband's throat from ear to ear" if she opened her mouth again. Mrs. Stevens positively identified both these appellants as two of the three negroes who raped her before she lost consciousness. The physical facts also indicated a struggle. Records of the United States Weather Bureau introduced in evidence showed that the moon was practically full that night; that there was no fog and the atmosphere was clear. Mrs. Stevens claimed she could plainly see the faces of her assailants.

It was not until about 2 or 2:30 o'clock that Mrs. Stevens regained consciousness, at which time she saw her husband lying on the ground a short distance away. She went to his aid, finally revived him, and they walked to a near-by house, from which they were taken to the police station, where they made complaint of what had happened. Testimony of the receiving hospital doctor indicated that when she arrived at the hospital Mrs. Stevens was very nervous, and the doctor discovered evidence that she had recently had intercourse. Subsequently the officers found the spare tire of Mr. Stevens' car in the shed at appellant Hannon's home. Investigation of Mr. Stevens' car indicated that the right rear tire was flat and that there were three clean cuts entirely through the sidewall of the tire, as though it had been cut with some sharp instrument.

Appellant Hannon admitted being present while Mrs. Stevens was in the vacant lot, but denied that he had intercourse with her. On another occasion he admitted he was "in the gang that took the white man and woman into the vacant lot at 115th and Grape". While in the presence of appellant Anderson the appellant Hannon stated to the officers that "Anderson was one of the boys over there with Mrs. Stevens in the vacant lot". In the face of this accusatory statement, Anderson stood mute. During his cross-examination as a witness in his own behalf at the trial, Han-

non admitted that at the time of his arrest he knew that he was being taken into custody because of "a little ruckus at 116th and Wilmington Saturday night."

Appellant Anderson testified at the trial that on the evening in question he was with Fred and Claude Stewart a little after 10 o'clock at the cafe in question; that he left the cafe after about ten minutes' stay therein and went to a pool hall across the street, where he remained about an hour, when he went home. He further testified that while he met appellant Hannon on 103d Street about 9:30 on the evening in question, he was not again with him that night, except to see him in the cafe. Appellant Anderson denied that he ever talked to Mr. Stevens or that he had seen Mrs. Stevens at all on the night of the alleged assault. He steadfastly denied that he had sexual intercourse with Mrs. Stevens or that he held a knife over her. He claimed that the first intimation he had of any trouble in which Mr. and Mrs. Stevens figured was after his arrest on July 22d. He denied the accusatory statement heretofore narrated as having been made by appellant Hannon, and claimed that when he denied complicity in the alleged assault after his arrest, the police officer struck him.

Appellant Hannon, testifying in his own behalf at the trial, stated that he saw Fred and Claude Stewart at the cafe in question at 10 o'clock, but did not remember definitely seeing his codefendant there. He admitted seeing Mr. and Mrs. Stevens at the cafe, where he remained for about two hours. He testified that he talked with Mr. Stevens for about an hour and that the latter had purchased two bottles of beer for him. He further testified that when he left the cafe he saw Mrs. Stevens sitting in a parked automobile with a colored man whom he did not know. He absolutely denied having any conversation with Mr. Stevens relative to fixing the tire on the latter's automobile, and further denied that he rode on the running board of the Stevens car, and also denied having intercourse with Mrs. Stevens or aiding or abetting in the consummation of such an assault by others. There was also introduced at the trial evidence of the previous good reputation of the appellants.

■■ Upon the foregoing state of the record, we are asked to declare that the verdict is contrary to law and to the evidence, in that the story told by Mr. and Mrs. Stevens is inherently improbable, and that it is also inherently improbable that

men bearing the previous good reputation of appellants would commit the atrocity here in question. It is axiomatic that an appellate tribunal cannot disturb the findings of the triers of fact unless it be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence, circumstantial or otherwise, to support the conclusion reached in the lower court. (*People* v. *Newland,* 15 Cal. (2d) 678 [104 Pac. (2d) 778]; *People* v. *Gidney,* 10 Cal. (2d) 138, 143, 144 [73 Pac. (2d) 1186].) No such showing is made in the instant case. True, there is an irreconcilable conflict between the testimony of Mr. and Mrs. Stevens and that given by the appellants. Our appellate jurisdiction, however, extends only to questions of law, and where the evidence which militates against a defendant, considered by itself without regard to conflicts in the evidence, is sufficient to support the verdict, the question ceases to be one of law—of which alone this court has jurisdiction—and becomes one of fact upon which the decision of the jury and the trial court is final and conclusive.

Appellants' contention that there is a lack of sufficient evidence to show reluctance and resistance on the part of Mrs. Stevens is without merit. The battered and bruised condition of Mr. Stevens, as well as the nervous state in which Mrs. Stevens was found, coupled with the evidence that she was menaced with a knife in the hands of one of her assailants, who threatened to ''cut her husband's throat from ear to ear'' if she opened her mouth, as well as the physical facts at the scene of the crime, which indicated a struggle, amply support a conclusion that no small degree of force and violence was used in committing the offense in the case at bar, and certainly belie the testimony of appellant Hannon that Mrs. Stevens walked freely and unassisted into the vacant lot with a colored man. In the face of all the evidence in the record before us, it would certainly tax one's credulity to indulge in the assumption that the acts of sexual intercourse were accomplished by and with the consent of Mrs. Stevens.

It is true that appellant Hannon testified that it would have been impossible for him to have accomplished an act of intercourse because of his physical disabilities, but the jury was entitled to disbelieve him in view of the medical testimony of the county jail physician who made a physical examination of him.

490

From the statement of facts already given, enough appears to show that appellants and certain other colored men, either expressly or tacitly, entered into an agreement to disable the Stevens car by cutting the right rear tire with some sharp instrument; that appellant Hannon was to offer to help change the tire if the car were driven around the corner and away from the lights of the cafe; that other participants were secreted in the back of the automobile; that subsequently Mrs. Stevens was raped by these appellants, both of whom she positively identified, and that other men present aided and abetted in the commission of the crimes by preventing Mr. Stevens from coming to the assistance and rescue of his wife.

It is next contended by appellants that the court erred in refusing to give two instructions on circumstantial evidence. The instructions in question were properly refused on the ground given therefor by the trial court—that the evidence in this case is basically direct and positive, and not circumstantial.

Appellants' further contention, that the only instruction the court gave the jury on the question of aiding and abetting was defective and insufficient, cannot be sustained. First of all, the instruction in question was a correct exposition of the law and is supported by section 31 of the Penal Code. However, the record discloses that during the deliberations of the jury, it returned into court, at which time, in response to the jury's request, the court, in the presence of appellants and their counsel, instructed the jury at considerable length on the subject of what constituted aiding and abetting in the commission of a crime. Not only did the trial court give to the jury the legal definition of what constituted one an aider or abetter, but the learned trial judge painstakingly and patiently explained what constituted aiding and abetting by giving to the jury concrete hypothetical examples of the manner in which one who, though not actually perpetrating the offense, would become guilty thereof and might be prosecuted as a principal therein, by aiding or abetting in its commission.

The judgments and the order denying appellants' motion for a new trial are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.