70 Cal.App.2d Supp. 872 (1945)
THE PEOPLE, Respondent,
v.
ERNEST GILES, Appellant.
California Court of Appeals. 
Aug. 29, 1945.
 Edward R. Young and Milan Medigovich for Appellant.
 Fred N. Howser, District Attorney (Los Angeles), Jere J. Sullivan and Robert Wheeler, Deputies District Attorney, for Respondent.
 BISHOP, J.
 The defendant, convicted on a charge of having used force and violence upon the complaining witness, was sentenced to serve six months in the county jail. We have concluded, upon his appeal from the judgment, that the evidence supports the conviction and that no reason exists for disturbing it, but that the judgment should be reversed with directions that the defendant be resentenced, because, in determining the severity of the sentence to be imposed, the trial judge erred in listening to and being influenced by accusations made against the defendant outside of court. The error referred to is not a trivial one. A person convicted of a traffic offense or of another of the many misdemeanors which have been created by state laws and local ordinances, has a real concern in the sentence which follows. Will it impose a light or a stiff fine? Or is there to be a term in jail instead of a fine? It is a matter of more than passing interest, therefore, to know whether or not the trial judge may properly take into consideration, in determining the sentence, reports against the defendant which come to the judge privately, neither in open court nor known to the defendant, and which he is given no opportunity to answer. [70 Cal.App.2d Supp. 875]
 [1a] As we have stated, the evidence supports the conclusion that the defendant did use force unlawfully upon the complaining witness. The latter, it appears, had been charged with a minor traffic violation by a complaint filed in the City Court of the City of Vernon, where the defendant, who was the city's chief of police, was acting as bailiff. The complaining witness was considerably incensed at having his bail set at $200 when he pleaded not guilty and asked for a jury trial. When he found himself unable immediately to post bail, he did not yield graciously to being taken into custody by the defendant. In spite of his verbal and other protestations, however, the complaining witness was taken into custody and to the booking office of the city jail. There he continued to evince his unhappiness at what had taken place, by provoking words and perhaps provoking acts, until the defendant put a stop to it by choking him, for a brief moment. But the provocation, however great, was not legally sufficient to justify the defendant's use of force in any degree upon the complaining witness, who was at the time in custody as his prisoner.
 [2] Standing convicted of the crime of battery, the defendant was subject to a fine (up to one thousand dollars) or to a jail sentence (not exceeding six months) or to a combination of the two (Pen. Code, 243). To aid it, no doubt, in arriving at a just determination of the proper sentence to impose, the trial court referred the matter to the county probation officer for a report, and set the time for sentencing the defendant ahead twenty days. This course was a proper one, although the defendant was ineligible for probation, for the probation officer is to report not only as to matters of interest re probation, but he is further directed (Pen. Code, 1203) "to investigate and report to the court at a specified time, upon the circumstances surrounding the crime and concerning the defendant and his prior record, which may be taken into consideration either in aggravation or mitigation of punishment." In this case, however, the probation officer's report, filed two days before the date set for the hearing, proved of little, if any, guidance to the trial judge, for his views in the matter became darkly colored from other, unofficial, reports he received.
 [3a] That the trial judge listened to accusations made [70 Cal.App.2d Supp. 876] against the defendant out of court, and that they largely influenced his judgment, is clear from the events which took place at the time set for sentencing the defendant. "I will say in the beginning," the trial court prefaced the proceedings, "that I have received a great many telephone calls, letters and personal requests in this matter, and all of them so far have been against the defendant. I will read one letter from the probation officer's report, which duplicates most of the information I have received in an unsatisfactory hearsay sort of manner. I have tried my best to avoid hearsay testimony and not base anything on just rumor and hearsay and unreliable statements. I want to assure you in the beginning that the only purpose I have in this case is to try to rescue San Antonio Township and the City of Vernon from what most people seem to think is a bad situation."
 The letter referred to was then read into the record. It was one from a Mr. Needle, and its gist is found in this paragraph: "The Chief of Police of Vernon should have never been allowed to come out on probation, for he is a menace to society; like myself, many other American citizens feel that he should be put away where he could do no further harm. He never did any direct harm to myself, but I am witness of some of his injustice in the performance of his duty. For instance, there was a certain day when a lady was letting out a soldier to whom she had given a lift, and in no way violating the traffic laws, and I saw an officer give that lady a citation. I saw that injustice and my heart bled when I found myself unable to do anything about it." The trial judge again referred to this letter when he said: "I might say that this probation officer's report here contains about a dozen letters from Mr. Giles' friends and he only gathered up one letter against Mr. Giles." We make no comment upon the value of this letter as an aid to the court in determining what punishment to inflict upon the defendant, other than to say that evidence may have graver faults than that of being hearsay.
 Following the reading of the letter, two witnesses were called and interrogated by the trial judge. The first was a newspaperman who had found the office of the Chief of Police of Vernon and, upon one occasion years before, the chief himself, very uncommunicative when asked for "the names, etc." of the persons involved in accidents which, presumably, although it was not stated, the department had investigated. [70 Cal.App.2d Supp. 877] Following the conclusion of the testimony of this witness, the trial judge inquired "Is there any other news man here who cares to say anything on this matter? Of course, I realize the fact that the news men are in a rather tough spot in this case and I won't insist on hearing any more on that. They have certainly told me enough on the side about the matter, however." Later, following a statement by defendant's counsel to the effect that so far there was no evidence that the press had been denied access to the police department, the trial judge remarked, "The previous witness testified he had been, and dozens of people have told me the same thing, even though they are afraid to come here this morning because they are afraid of physical violence by the police department of Vernon."
 The second witness called by the trial judge was the Mayor of the City of Vernon. "The point is," the trial judge announced by way of explanation, "if the Mayor instructed this sort of thing I would forgive Mr. Giles for it. If he does it on his own volition that makes him solely responsible." The Mayor testified that he had never given any instructions to the defendant with reference to the treatment of prisoners in the city of Vernon, and he had not heard that the police department had refused to cooperate with the Metropolitan press regarding persons arrested in the city of Vernon, and the trial judge expressed his conviction that the mayor "had nothing to do with the matter." This, it would seem, left the onus on the defendant for the failure of his office to cooperate with the press concerning arrests, a matter expressly stated by the witness first called to be not within his "information," and so if known to the trial judge at all was known only by virtue of the "dozens of people" who had told him about it on the outside, but who were afraid, according to the trial judge's report, to appear as witnesses in his court. There was no witness to any mistreatment of any prisoner other than of the complaining witness; that is, no witness who testified in court.
 The City Attorney of Vernon was called by the defendant as a witness, but was immediately taken over by the trial judge, who addressed to him these statements and questions, each revealing a state of mind, existing in the trial judge, not brought about by any court witness or judicial proceeding: "Do you know anything about his reputation that he seems [70 Cal.App.2d Supp. 878] to have developed of brutality or ill-considered treatment of the public or press, or anything of that kind?" "Do you know about this rule in the Vernon Police Department which requires the taking of the name and address of every person who comes into the police headquarters?" "Do you know about the law that no trailer is allowed to park in Vernon for more than thirty days?" "Do you know why it is that it is so impossible for the press to get any information from the police department?" The inquiries put to the witness concluded with this colloquy: "Q. Let me ask you this: Have you ever heard of a jury trial being granted in Vernon? A. Yes, sir. Q. How many times? A. Well, I have acted as prosecutor down there a good many times. Q. How long ago was that? A. Well, I think the last one was about a month ago. Q. You actually got a jury, did you? A. Absolutely. A jury trial is never denied anybody in Vernon. THE COURT: I understand the judge has a system of hiking the bail so that only rich men can get bail." The witness's replies to the facts assumed in the various statements and questions were, with one exception, to deny that they were facts or to disclaim having any knowledge of them. He knew that it was the practice to take the name and address of those who called at police headquarters for information, and added that it was he who had suggested the practice, many years ago. But except as noted, no substance was given by his testimony to any of the assumed facts contained in the court's statements and questions. They remained based solely upon the reports which had come to the trial judge, ex parte.
 We are not undertaking to answer the question: What relevancy did the matter of jury trials, and the several other matters inquired about, have to the problem then before the court, the problem of determining what was a just and proper sentence to be imposed on the defendant? Nor are we passing upon the propriety of making the proceeding by which the sentence to be imposed upon the defendant was to be determined, a proceeding "to rescue the City of Vernon and bring it back into the United States," as the trial court stated he was trying his best to do. Our attention is centered upon an inquiry into the legal propriety of the practice of a trial judge who, in making up his mind as to the punishment to be imposed upon a convicted defendant, receives and gives heed to charges leveled at the defendant out of court and out of the defendant's hearing. [70 Cal.App.2d Supp. 879]
 [4] In section 1204, Penal Code, we discover the Legislature expressly condemning the practice followed by the trial court. That section, referring to circumstances which may either aggravate or mitigate the punishment, states: "The circumstances must be presented by the testimony of witnesses examined in open court. ... No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section." We are not exploring the field of speculation arising out of the repeated and drastic changes made through the years in the "preceding section" to determine the effect of the amendments upon the provisions of section 1204, for we are persuaded (we are not elaborating the matter) that the provisions of section 1204 are limited in their application to proceedings in the superior court; they do not constitute legislation governing proceedings in justices' courts. But we note that there is not a word in that chapter of the Penal Code which does prescribe the proceedings for justices' courts ( 1425-1461) which is in any way inconsistent with the policy enunciated in section 1204, and that policy, we find, is the policy that governs in the absence of express legislation on the subject.
 [5a] In the first place, "The several sections of this code which declare certain crimes to be punishable as therein mentioned, devolve a duty upon the court authorized to pass sentence, to determine and impose the punishment prescribed." (Italics ours.) (Pen. Code, 12.) "Whenever in this code the punishment for a crime is left undetermined between certain limits, the punishment to be inflicted in a particular case must be determined by the court authorized to pass sentence, within such limits as may be prescribed by this code." (Pen Code, 13.) The words of these two sections (to which we have added the emphasis) need no interpretation. Plainly they stamp the steps to be taken to determine the severity of a sentence as a part of the judicial proceedings in the case. The duty here imposed upon the court is closely analogous to that imposed upon the court in these words of section 1192 of the Penal Code: "Upon a plea of guilty of a crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree." Of these two duties we find the Supreme Court speaking in People v. Gilbert (1943), 22 [70 Cal.App.2d Supp. 880] Cal.2d 522, 528 [140 P.2d 9, 12], in these words: "In determining the degree of an offense and the punishment to be imposed, after a plea of guilty, it is the duty of the trial court to consider matters in aggravation as well as in mitigation of the offense. The legal significance of established facts may well constitute an element of which cognizance is taken in the exercise of judicial discretion. A hearing for the determination of the degree of an offense and the punishment therefor is not a trial in the full technical sense, and is not governed by the same strict rules of procedure as a trial. As stated in People v. Williams, 14 Cal.2d 532, 536 [95 P.2d 456] (quoting from People v. Popescue, 345 Ill. 142, 153, 158 [177 N.E. 739, 77 A.L.R. 1199]) it is 'simply a statutory hearing, by which the court examined witnesses to determine whether any facts existed to aggravate or mitigate the punishment,' and 'in considering evidence in aggravation or mitigation of the offense the court may consider many matters "not admissible on the issue of guilt or innocence" ....'" [6] The fact that the hearing is not a trial in the full technical sense and is not governed by the same strict rules of procedure as a trial, does not mean, however, that the facts needed by the court to enable it to perform its duty may be picked up by the judge at the club or on the street. In People v. O'Brien (1932), 122 Cal.App. 147, 155 [9 P.2d 902, 905], we find this statement: "Notwithstanding the fact that it has been decided that the hearing which may be conducted by the trial court for the purpose of determining the degree of the offense 'is not a trial', nevertheless the only means by or through which the court is authorized to reach a conclusion in the matter is by the aid of evidence. (People v. Chew Lan Ong, 141 Cal. 551, 553 [99 Am.St.Rep. 88, 75 P. 186, 187]; People v. Bellon, 180 Cal. 706 [182 P. 420, 421].)" In the first case cited in the text just quoted (People v. Chew Lan Ong) the defendant had pleaded guilty to the charge of murder and had been sentenced to death. The contention was made, on appeal, that the trial judge had no power to determine the degree of the crime for the reason that the section which purported to grant the power ( 1192, quoted above) failed to provide the "mode whereby the court is to reach its determination." The Supreme Court disposed of this contention with these words, pertinent to our problem (p. 552): "Jurisdiction to determine the matter is, however, expressly conferred on the court by the section. This means that there shall be a judicial determination, [70 Cal.App.2d Supp. 881] and where power is especially conferred upon a court of general jurisdiction to determine a particular question, and no special mode for that determination is pointed out, the jurisdiction conferred necessarily implies authority in such court to call to its assistance in determining the particular question, the same aid as is usually employed by it in reaching a judicial determination in other cases."
 "The universal aid is evidence. This was the means employed by the lower court in determining the degree of crime in the case at bar. It is the only means by which a judicial determination can be had, and was the means which it was contemplated by the legislature should be invoked by the court."
 "If there could be any doubt of this general rule, we are satisfied that the course pursued by the lower court is provided for and sanctioned by section 187 of the Code of Civil Procedure, which declares that 'When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."
 [7a] Our conclusion that the determination of the sentence to be imposed upon a defendant convicted of a misdemeanor should not be based even in part upon statements which come to the ear or eye of the trial judge in an unofficial way, finds further support in these two legal principles: the defendant has a right to be present when judgment is imposed upon him, and he has a right to be confronted by the witnesses who have accusations to make against him. As to the first of these principles, again we find the Penal Code silent, but the common law is not silent. [8] While it is true that "In this state the common law is of no effect so far as the specification of what acts or conduct shall constitute a crime is concerned. (Sec. 6, Pen. Code; 7 Cal.Jur. 841)," (People v. Whipple (1929), 100 Cal.App. 261, 262 [279 P. 1008, 1009]), with respect to criminal procedure, "The common law is in force as law in this state in the absence of statutory provisions at variance with the common law." (Ex parte Hudspeth (1929), 100 Cal.App. 478, 479 [280 P. 179, 180]; Pol. Code, 4468.) [7b] Looking, then, to the common law, we find the general [70 Cal.App.2d Supp. 882] rule to be that in the absence of a statute to the contrary, one convicted of a misdemeanor for which a jail sentence may be imposed has the right to be present when the judgment is rendered. (24 C.J.S. Criminal Law, 1574b, p. 79, 15 Am. Jur. 113; 1 Bishop's New Crim. Procedure (2d ed.) p. 241.) [9] One of the purposes of requiring that the defendant be present may well be to give him an opportunity to show that accusations made against him, other than the one of which he stands convicted, are without foundation, and a chance to object to the consideration of improper evidence. In the latter connection, see People v. O'Brien, supra, 122 Cal.App. 147, 157 [9 P.2d 902, 905].
 [10] Closely allied to the principle just considered is the second of the two to which we made reference. We find it to be recognized in People v. Beatty (1923), 132 Cal.App. 376, 380 [22 P.2d 757, 759], that "... the right of a defendant to be confronted by witnesses is fundamental. ... The right in this state is guaranteed by section 686 of the Penal Code, and the defendant can be deprived of the same only by statutory authority to the contrary. (People v. Ward, 105 Cal. 652 [39 P. 33]." Insofar as the code approves the gathering of evidence by the probation officer and its inclusion in his report, there is "statutory authority to the contrary." But no exception to the fundamental right has been made authorizing the trial court to listen, out of court, to witnesses whispering against the defendant.
 We find two decisions from sister states which condemn the practice followed by the trial court in the present case as being in violation of the fundamental right of a person to be confronted by the witnesses against him. The first of these is State v. Simms (1925), 131 S. C. 420 [127 S.E. 840], where the defendant had been sentenced to four months' imprisonment and a $500 fine for a violation of a state law. In sentencing the defendant the trial court remarked, "Mr. Simms, you must be a bad man. A number of people from your community have been to see me at my office about you, and they have all spoken against you. I have been impressed with the fact that no one has come to see me to speak a good word in your behalf." The Supreme Court of South Carolina set the sentence aside and remanded the case to the trial court for a resentence, stating that they did so in reliance upon a prior decision wherein they had said that the information necessary to pass sentence should have been obtained in open [70 Cal.App.2d Supp. 883] court, or in the presence of the defendant or his counsel, and that the defendant "has a right that everything appertaining to the case, in the way of evidence affecting the case, be open and above board and public. ..."
 The second of the two cases from sister states is Commonwealth v. Johnson (1944), 348 Pa. 349 [35 A.2d 312]. In this case the defendant had pleaded guilty to the charge of murder, and the degree of the crime and the sentence had been determined by three judges sitting en banc. These judges talked with the warden of the penitentiary where the defendant had been confined when the murder was committed, and from one source and another, all out of court and not in the presence of the defendant, had picked up quite a bit of information, none to his credit. "No one has a good word for him--he is troublesome and dangerous," reported one of the judges. The judgment imposed was reversed because "the record does not show affirmatively that no ex parte evidence was received by the court before it determined and declared the degree of the defendant's guilt of murder." The reversal was not because of the ex parte receipt of evidence in connection with the punishment to be inflicted. However, the opinion contains these declarations which we find pertinent to the latter matter (pp. 313, 314, [35 A.2d]): "It is a prisoner's constitutional right in this Commonwealth 'to meet the witnesses face to face' (Sec. 9, Declaration of Rights Const. P.S.). In Com. v. Corsino, 261 Pa. 593 at page 598, 104 A. 739, 740, we held: 'It is the inherent right of the prisoner in a capital case to be present at every stage of the proceedings from the arraignment to the rendition of the verdict. Neither court nor judge can take any step affecting his right in his absence.' ... A judge whose duty it is to determine the proper sentence imposed on those convicted of crime cannot be expected to limit himself to only that which appears in the record of the trial of the prisoner. It is to the benefit of society and it may be of benefit to the prisoner, to have the sentencing judge consider facts other than those adduced at the trial. Such facts might militate in a prisoner's favor or they might militate against him."
 "However, when a judge is faced with the duty of determining whether or not a convicted murderer is to be sentenced to death or life imprisonment the seriousness of the problem is such that a judge who is possessed of that zeal to do justice [70 Cal.App.2d Supp. 884] which characterizes the just judge, will as far as is practicable, give the defendant an opportunity to confront the witnesses against him and to offer evidence in his own behalf. Such a procedure if followed will be informative to the understanding and enlightening to the judgment, of the sentencing tribunal."
 Our conclusions, then, are these. [1b] The defendant was regularly convicted, on sufficient evidence, of the charge of battery. [5b] In undertaking to ascertain facts from which it could determine what sentence should be imposed on the defendant, the trial court was engaged in a judicial proceeding. [3b] Such facts as were not supplied by the probation officer's report and by the record of the trial, which had been held, should have been obtained from the lips of witnesses called in open court, in the presence of the defendant. Instead of limiting his search for the facts to these proper sources, the trial judge listened and gave great weight to reports received outside of court, with the result that the judgment entered was prejudicially influenced by these improperly received accusations. For these reasons we reverse the judgment with directions that the defendant be rearraigned for sentence after proceedings conducted in harmony with the principles set forth in this opinion.
 Shaw, P. J., and Kincaid, J., concurred.