[Crim. No. 5344.  Third Dist.  Jan. 9, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
RICARDO MATTHEW KRAFT, Defendant and Appellant.

COUNSEL

David A. Wilson for Defendant and Appellant.

·Thomas C. Lynch, Attorney General, Doris H. .Maier, Assistant Attorney General, Edsel W. Haws and Nelson P. Kempsky, Deputy Attorneys General, John Price, District Attorney, and Peter Franchi, Deputy District Attorney, for Plaintiff and Respondent.

OPINION

**PIERCE, P. J.**—Defendant was convicted, after a nonjury trial in the municipal court of misdemeanor drunk driving (violation of Veh. Code, § 23102, subd. (a)). He appealed to the appellate division of the superior court. That court by a two to one decision affirmed the judgment. This court accepted certification "to secure uniformity of decision and to settle important questions of law." (Cal. Rules of Court, rule 63(a).)

After defendant had been arrested a blood sample was taken. The analysis was introduced into evidence. It showed a blood alcohol content of .24 of 1 percent. Defendant had refused to submit voluntarily to·that or any other of the tests specified in Vehicle Code section 13353. Force was used in the taking of the sample. This court will hold that the force used was under the circumstances unlawfully excessive. Although the actual withdrawal of blood itself may not have been objectionable, it was immedi-

ately preceded by conduct such as to constitute the process as a whole not "medically acceptable" and therefore judgment must be reversed.

The reasons for our conclusions will, we think, be clearer if we reverse the traditional opinion writing method by discussing the rules of law involved before outlining the facts.

In cases not involving the California "Implied Consent Law" (Veh. Code, § 13353) utilization of the results of chemical analyses performed upon a blood sample drawn from a nonconsenting defendant has been held permissible as against constitutional attacks under the Fourth, Fifth, Sixth and Fourteenth Amendments. *Schmerber* v. *California* (1966) 384 U.S. ·757 [16 L.Ed.2d 908, 86 S.Ct. 1826], launches most jurisdical discussions where this topic has been relevant. Defendant Schmerber, suspected of drunk driving, had been taken to a hospital for emergency treatment after an automobile accident. A blood sample was drawn by a staff physician, acting at the direction of a warrantless police officer, despite defendant's refusal to consent to the test. Report of the chemical analysis was admitted in evidence at the trial. Defendant was convicted of drunk driving. In *Schmerber* a majority of the court overruled defendant's contentions that admission in evidence of the results of the blood analysis violated his right to due process under the Fourteenth amendment, his privilege against self-incrimination under the Fifth Amendment, his right to counsel under the Sixth Amendment, and his right against unreasonable searches and seizures under the Fourth Amendment.

The court in *Schmerber* analyzed *Breithaupt* v. *Abram,* 352 U.S. 432 [1 L.Ed.2d 448, 77 S.Ct. 408]. It pointed out that there the defendant driver was unconscious and that the blood had been withdrawn in a "simple medically acceptable manner." (*Id.* 384 U.S. at pp. 759-760 [16 L.Ed.2d at·p. 913].) Thus there was no act offensive to that "sense of justice" condemned in *Rochin* v. *California,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396]. *Breithaupt,* said the *Schmerber* court, required denial of the ·argument that involuntary blood withdrawal was per se a denial of due process. (*Id.* 384 U.S. at p. 760 [16 L.Ed.2d at p. 914].) The court also held that since the privilege against self-incrimination applied only to evidence testimonial or communicative in nature the Fifth Amendment had not been violated. (*Id.* at p. 761 [16 L.Ed.2d at p. 913].) The court also held that Sixth Amendment rights had not been violated. Defendant had been represented by counsel. The contention was that because defendant's objection to the taking of the test had been made on the advice of counsel his Sixth Amendment right to counsel had been infringed. The court said (at p. 766 at 384 U.S. [16 L.Ed.2d at p. 917]): ". . . Since petitioner was not entitled to assert the privilege, he has no greater right because counsel erroneously advised him that he could assert it. . . . No

issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented."

The court next considered the search and seizure claim. The contention that a search warrant should have been obtained was answered by the court's recognition of the fact that alcohol in the blood stream is rapidly absorbed by the body and that the delay involved in obtaining a search warrant might destroy the value of a blood analysis. (*Id*. 384 U.S. at pp. 767-768 [16 L.Ed.2d at pp. 917-918].)

The court did not hold—indeed respondent did not argue—that the administration of a blood test is entirely free of Fourth Amendment constraints. The majority opinion is liberally sprinkled with phrases abjuring "intrusions into the body . . . not justified in the circumstances, or which are made in an improper manner," and the court demands that "means and procedures employed . . . [must respect] relevant Fourth Amendment standards of reasonableness." (*Id*. 384 U.S. at p. 768 [16 L.Ed.2d at p. 918].) But the opinion also contains "on-the-other-hands," saying that the "quantity of blood extracted [in a blood analysis] is minimal" and "involves virtually no risk" when withdrawn "by a physician in a hospital environment according to accepted medical practices." (*Id*. 384 U.S. at p. 771 [16 L.Ed.2d at p. 920].) The opinion concludes with the warning (on p. 772 [16 L.Ed.2d at p. 920]): "It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor instrusion into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."

*Schmerber* was first referred to and applied by our Supreme Court in *People* v. *Sudduth* (1966) 65 Cal.2d 543 [55 Cal.Rptr. 393, 421 P.2d 401]. That case did not involve the taking of one of the chemical tests specified in our implied consent law. It involved the right (which was upheld) of the prosecutor to comment on the refusal of a defendant to submit to a breathalizer test.

This court held in *People* v. *Fite* (1968) 267 Cal.App.2d 685 [73 Cal. Rptr. 666], that Vehicle Code section 13353 did not supersede other penal provisions and that a defendant who had physically submitted to a test given, although verbally refusing consent thereto, could not escape prosecution and sentencing for felony drunk driving; that the results of the chemical analysis were properly admitted against him at the criminal trial; and that evidence of his attempted refusal was similarly admissible at that trial. The additional statement "in the absence of force and violence" was

repeated in the majority opinion in *People* v. *Wren* (1969) 271 Cal.App.2d 788, 791-792 [76 Cal.Rptr. 673].

The phrase "in the absence of force and violence" is troublesome. How much force is force? ■ Under the portion of the opinion in *Schmerber, supra,* which we have quoted above, it is obvious that that amount of force which exceeds "relevant Fourth Amendment standards of reasonableness" may not lawfully be employed. It is also certain that the bounds of reasonableness are exceeded unless blood is withdrawn "according to accepted medical practices." In the case now before us the majority opinions in the superior court did not construe the evidence as showing a violation of Fourth Amendment standards of reasonableness. The minority opinion disagreed. We now examine the facts.

In the early morning hours defendant was observed by two patrolling police officers, Curtright and Spieth, driving an automobile northward along Watt Avenue. Watt Avenue is a well traveled thoroughfare in Sacramento County. Defendant was driving on the wrong side of the street. Defendant's car made a right turn onto a side street and "with some difficulty" it proceeded into, and was parked in, a driveway. One of the officers approached defendant as he alighted from the car. He noted a strong odor of liquor about defendant. Defendant was standing in front of the door by the driver's compartment. There was a pile of gravel at that point on which defendant was standing. Curtright took hold of defendant by the arm and shoved him back into the street. He did not shove very hard but it caused defendant to fall down. When he got up he was unsteady. The officer asked for his driver's license. At first he refused to surrender it but did later. A series of roadside tests were given, as the result of which the officers determined defendant was very intoxicated. He was placed under arrest for violation of Vehicle Code section 23102, subdivision (a) (misdemeanor drunk driving). He was advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974]. He was then handcuffed and taken to the city emergency hospital. At the time of the arrest defendant's right arm was bandaged above and at the wrist and in the metacarpel area. He told the officers that it ached but when asked the cause he said "forget it." Subsequently, he told the doctor he had suffered a fracture three weeks earlier. On the ride to the hospital defendant complained continuously about pain due to the handcuffs. To the officers this was the customary behavior of a handcuffed prisoner. During the ride downtown defendant carried on a silly conversation. When the trio reached the police station, the officers started to take defendant to the hospital. At that point he became what Officer Curtright described as "resistive." He was taken into the hospital anteroom physically.

The officers "used force to get him in." As Officer Curtright testified: "It wasn't very friendly persuasion." Officer Spieth testified that he struck defendant on the left side of his "cheek" with his closed fist. The testimony of the two officers differs as to why the blow was struck; also as to the circumstances surrounding the incident. Curtright said that defendant was not "aggressive"; that he was "defensive"; that he, Curtright, had grabbed defendant's right arm and had shoved him. When Officer Spieth struck defendant, Curtright could recall no provocation for the blow. Officer Spieth, however, testified that defendant had threatened during the ride he would use force when his handcuffs were removed; and that when they were removed he had raised his arms (with neither of the officers touching him) as though to strike. That testimony, however, was inconsistent with the following: "[A]fter getting out of the squad car—were the handcuffs removed at that time? A. Yes, the handcuffs were removed." At some point—the record is not clear as to just when—Curtright advised defendant of the provisions of Vehicle Code section 13353. (In defendant's condition as then and thereafter established the advice must have conveyed the knowledge equivalent to an attempt to explain the rule in Shelley's case.) It did evoke defendant's refusal, however, to submit to any of the tests that section specifies. He was informed by the officers that a test would be taken whether defendant consented or not. Defendant stated, "It's not right. It's not moral." Some force was used in causing defendant to be seated in a chair.

Dr. Hockinberry, the physician on duty, entered the examination room where defendant was seated. Requests of defendant to submit to one of the three tests were repeated. Defendant still refused. He did respond to several routine questions by the doctor.

A withdrawal of blood was made. Before that was done defendant started to submit, then resisted. Both officers grabbed his arms. There is evidence that they tried to carry or lead him to a bed located in the examination room. In the process defendant fell or was pushed from a chair and he and the officers fell to the floor. Defendant fell on top of Officer Spieth. On the floor defendant was immobilized. The officers applied force sufficient to hold his left arm still. The doctor was able to and did apply a tourniquet to the upper arm, cleanse the area, inject a syringe needle and withdraw blood. We describe the material evidence on these happenings in the margin.[1]

---

[1]Officer Curtright testified: "Q What did you do? Then what happened? A We took hold of Mr. Kraft's arms; attempted to place him on the bed, were unsuccessful, fell to the floor, and he was then placed on the floor, face down—mostly face down, and I held his right arm up and Doctor Hockinberry drew the sample. Q And he drew it from the right arm? A As I recall, it was the inside of the right arm. Q All right, and where was [your fellow officer] Mr. Spieth while you were doing all this? A He was assisting me in placing Mr. Kraft on the floor. Q Did Mr. Spieth have hold of any portion of Mr. Kraft's body at this time? A As I recall, he had ahold of his other arm and was across his legs, or slightly under his legs, actually. Q And, how did you have his right arm, and hold him in position for the doctor—could you

The municipal judge who decided that defendant was guilty on the basis of the evidence related saw the witnesses, heard their testimony and observed their demeanor on the stand.

Ordinarily that fact would be entitled to great weight. In this case, however, the municipal court judge's position was equivocal. He limited interrogation of the doctor (who was present) to questions relating to the technical medical aspects of the blood taking, indicating that if the blood taking itself had been aseptic and by a qualified medical doctor the law would have been complied with. On the other hand, on request he permitted written argument at the close of the trial on the issue of excessive force, although the record indicates nothing either pro or con to establish whether he considered the excessive force argument. We believe, however, that the testimony of the officers which we have quoted in the margin (see fn. 1) is unequivocal. Although the testimony of Officer Spieth is somewhat less emphatic than that of Officer Curtright, neither officer contradicts the other and both make it clear to us that excessive force *was* used.

From the cases reviewed above there has emerged no more definitive rule than that restraints exercised by police officers must be reasonable. In *Kesler* v. *Department of Motor Vehicles* (1969) 1 Cal.3d 74 [81 Cal.Rptr. 348, 459 P.2d 900], our Supreme Court has said in interpreting Vehicle Code section 13353 (at p. 77): "A court should interpret legisla-

describe, or tell us? A I had him face down with his right arm tilted back—brought back up and turned to the inside—palm toward the back of his head—the palm of his hand toward the back of his head. . . ."

Further elaboration of the means used to take the blood was obtained upon cross-examination of Officer Curtright as follows: "Q Each of you had one arm, initially? A Initially, we grabbed his arms as he sat in the chair, then we put his arm over the—a little table, for the Doctor to work on, and he—he started to submit. At that point the Doctor approached him, and he withdrew his arm, but he didn't initially withdraw his arm. I don't recall whether or not the Doctor actually got the needle in at that point, but he started to submit and then he again refused. We then placed him on the ground and held him physically while the Doctor withdrew the sample. Q Now, you say 'placed him on the ground.' You in fact twisted his arms and knocked him to the floor? A We didn't twist his arms and knock him to the floor, but we did have ahold of his arms and we did go to the floor. But it wasn't a knocking motion on his part; we fell. We fell on top of Officer Spieth. Q All right. And then you indicated he was mostly—mostly prone—mostly on his face? A Yes, Sir. Q On the floor? A Yes, Sir. Q And you twisted, you think it was his right arm? A I believe so. Q Behind his back? A I believe so. Q And you think the Doctor took the blood from the—for want of a better term, the interior of the elbow, or near the elbow? A In that vicinity, yes, Sir. . . Q . . . At the time that you were holding his arm behind his back, were you in a kneeling position on the floor, or a sitting position, or what? A I was crouched. Q You were crouched? A I was crouched. Q On your feet—were you kneeling on him, by any chance? Did you have your body on Mr. Kraft? A Yeah—yeah, I have some recollection, but I don't recall specifically being on Mr. Kraft. I may have— I don't recall. Q But you were—what direction were you facing? Were you watching . . . . A Facing Mr. Kraft and watching his head."

tion reasonably and should attempt to give effect to the apparent purpose of the statute. ■ Our implied consent statute, including section 13353, was enacted to fulfill the need for a fair, efficient and accurate system of detection and prevention of drunken driving. (*People* v. *Sudduth,* 65 Cal.2d 543, 546 [55 Cal.Rptr. 393, 421 P.2d 401]; *Zidell* v. *Bright,* 264 Cal. App.2d 867 [71 Cal.Rptr. 111].) ■ The immediate purpose of section 13353 is to obtain the best evidence of blood alcohol content at the time of the arrest of a person reasonably believed to be driving while intoxicated. The long range purpose is, of course, to inhibit intoxicated persons from driving on the highways. (*Zidell* v. *Bright, supra,* at pp. 869-870.)"

We test reasonable police behavior here by giving further consideration to the sequence of events. Up to the point when defendant with the two officers reached the portals of the police station the only thing they had done which could be challenged in the handling of this quite apparently intoxicated defendant was to push him (or cause him to fall) onto a gravel pile. The officers had more than probable cause to arrest him; also to handcuff him to take him to jail, using all force reasonably appropriate to accomplish that. To that point no constitutional right was violated; no right of privacy; no illegal search or seizure; no violation of due process—there was no lack of fair play. It is when we step over the threshold of the hospital anteroom that constitutionally forbidden practices emerge. We need not paraphrase the testimony which we have quoted in the margin (see fn. 1). But a sentence added from Officer Spieth's testimony is significant. It graphically illustrates the restraints under which defendant was being held when the blood sample was taken. The officer said: "My position [on the floor] was holding on to his left arm, trying to get it in an immobile position. *Also, I believe I had a scissor lock on his legs.*" (Italics ours.)

*Schmerber* v. *California, supra,* 384 U.S. 757, was written with *Briethaupt* v. *Abram, supra,* 352 U.S. 432, as its background and its warning given (as quoted above) with the following quotation from the latter case in mind (on p. 438 [1 L.Ed.2d at p. 452]): "This is not to say that the . . . taking of blood under different conditions . . . may not amount to such 'brutality' as would come under the *Rochin* rule." ·

■ The words "force" and "violence" have different meanings in different contexts. E.g., in the law of battery "the slightest touching of another if it is unlawful" is battery and "violence and force are synonymous." (Perkins, Criminal Law, p. 80.) On the other hand, *People* v. *Fite, supra,* 267 Cal.App.2d 685, although it uses the words "force or violence" (on p. 691) relates the use of those words to "brutal or shocking" force (on p. 687). And this court in *People* v. *Barton* (1968) 261 Cal.App.2d 561 [68 Cal.Rptr. 157], hear. den. · (a case not involving the Implied Consent

Law) states relevantly on pages 563-564: "The principle which excludes illegally obtained evidence in criminal trials [citations] has resulted in the crystallization of constitutional rules governing admissibility of physiological intoxication tests performed upon arrested persons and, correlatively, of evidence of refusal to accept testing. The withdrawal of a blood sample in a medically approved manner, although without the subject's consent, does not deprive him of his Fifth Amendment privilege against self-incrimination [citations fn. 3]; *when conducted under nonbrutal circumstances,* does not violate the Fourteenth Amendment's guarantee of due process of law; constitutes a search of the person but, when incident to a lawful arrest and performed in a reasonable manner, does not violate the Fourth Amendment's proscription against unreasonable searches." (Italics ours.)

The warning in *Schmerber* and the statement in *Kesler* v. *Department of Motor Vehicles, supra,* 1 Cal.3d 74, quoted above, as we have suggested, make it clear that each case must be decided on its own merits. ■ Within the precepts of due process "strong arm" behavior by police officers cannot be tolerated even while we recognize the principle epitomized in *People* v. *Sudduth, supra,* 65 Cal.2d 543, where the court says (on p. 546): "In a day when excessive loss of life and property is caused by inebriated drivers, an imperative need exists for a fair, efficient, and accurate system of detection, enforcement and, hence, prevention." That we recognized to be a principle purpose in the enactment of the Implied Consent Law when we said in *Fite, supra* (on p. 688 of 267 Cal.App.2d, quoting): " 'The purpose of section 13353 is to reduce the toll of death and injury resulting from the operation of motor vehicles on California highways by intoxicated persons . . .' " ■ This court reasons that in crimes which have no direct victims such as the crime involved in *Rochin, supra,* (where force to compel a defendant to disgorge a swallowed narcotic was involved) police officers may properly be held to somewhat stricter standards in testing whether their behavior comports with constitutional requirements than in the enforcement of criminal laws, such as drunken driving, where "one for the road"—and "there but for the grace of God go" many of us—may, and more frequently than not does, victimize innocent people and not infrequently wipes out whole families. The driver accused of drunkenness is, if guilty, typically recalcitrant, obstreporous and—not infrequently—belligerent. Greater restraints are necessary and, we think, to be condoned.

■ Nevertheless, the defendant here, as the officers freely admitted, was not "aggressive"; he was "defensive." The officers on the other hand, as a careful study of the record demonstrates, were aggressive beyond all need. Tolerance of the quantity of force used here will destroy rather than implement the salutary purpose of Vehicle Code section 13353.

We hold the limits of permissible police activity were exceeded.

Judgment is reversed.

Regan, J., concurred.

**DAVID, J. pro tem.,** * Concurring and Dissenting.——

This cause comes before us, upon certification from the appellate department of the superior court, solely because the dicta of *People* v. *Fite* (1968) 267 Cal.App.2d 685 [73 Cal.Rptr. 666], repeated in *People* v. *Wren* (1969) 271 Cal.App.2d 788, 791-792 [76 Cal.Rptr. 673], was that the taking of blood samples was not inhibited by the Fourth Amendment, "in the absence of force and violence." This was confusing logically because every such sampling requires a minimal force, and when resisted, requires even more. This was an inaccurate paraphrase of the constitutional requirement, which is, that the "seizure" must be reasonable, under the circumstances. In *Schmerber* v. *California,* 384 U.S. 757, 760, footnote 4 [16 L.Ed.2d 908, 913, 86 S.Ct. 1826], the court said: "We 'cannot see that it should make any difference whether one states unequivocally that he objects or resorts to physical violence in protest or is in such condition that he is unable to protest.' *Breithaupt* v. *Abram,* 352 U.S. at 441 [1 L.Ed.2d at 454](Warren, C. J., dissenting). It would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing or *responded to resistance with inappropriate force.*" (Italics added.) In the same case the United States Supreme Court further stated (at pp. 766-767 [16 L.Ed.2d at p. 917]): ". . . The question is squarely presented, therefore, whether the chemical analysis introduced in evidence in this case should have been excluded as the product of an unconstitutional search and seizure." And again, at page 768 [16 L.Ed.2d at p. 918], "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." In that connection, it is indicated that the sample should be taken under such medical conditions as would negative "an unjustified element of personal risk of infection and pain." (P. 772 [16 L.Ed.2d at p. 920].) Applying the further language of that court (at p. 772 [16 L.Ed. 2d at p. 920]) to the present case: "We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures."

I concur with the majority in the correction of the inappropriate dicta. I

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

also concur with the majority in holding that there is no showing of any violation of constitutional right to the "threshold of the hospital anteroom." I respectfully must dissent from the declaration of the majority that "although we deem the question to be a close one, that the force used was under the circumstances, unlawfully excessive." Neither the law nor any evidence supports the semantic gymnastics of declaring that "although the actual withdrawal of blood itself may not have been objectionable" the restraint used to hold the drunk still to permit the sample to be taken makes the process "medically unacceptable" within the caveats expressed by *Schmerber* v. *California, supra,* 384 U.S. 757, 759 [16 L.Ed.2d 908, 913, 86 S.Ct. 1826]. I do not conclude that "The officers . . . were aggressive beyond all need," and I am not pointed to any course of conduct at the very time and place which would have more speedily and reasonably accomplished the taking of the blood sample. The test is not whether officers are aggressive or defensive; it is whether the force which they are permitted or required to use is clearly excessive. The amount of force or strength used legally to overcome resistance must always be greater than the resistance. It is not only the one whose heart is pure whose "strength is as the strength of ten" for a loaded and resistive drunk may have the same. Drunks are not always friendly boisterous parlor comics or tragic figures weeping in alcoholic despair, to be gently ushered to a quiet corner, to sleep off the poison. One should hesitate a long time before overturning the verdict of the trier of the facts, and of the appellate department, for it is impossible to apply any gauge to a printed page to measure the mercurial moods of a resistive drunk, to guess in retrospect what was the boundary between reasonable and unreasonable force in his restraint. Even in this respect, the majority have disregarded the well-settled rule that that view of conflicting facts and inferences therefrom will be taken which will support the judgment of the courts below.

If it were conceded that the taking of the blood sample was an "unreasonable search and seizure," the judgment herein still should stand. The other evidence, as the majority concedes, was of itself clear and convincing. There is no Occasion to negative the conviction and to let the defendant go free, despite his clear violation of the rights of the public by his drunk driving.

There is not one iota of evidence that the taking of the blood sample by the doctor was not completely in accord with the approved medical practice. When he arose from his chair, the officers started to conduct the drunk to a bed where he could be immobilized sufficiently to enable the doctor to secure the blood sample. He fell on top of one officer, with the other officer partly upon him. The opportunity to hold him there with one officer with a scissors upon his legs, and the other twisting his arm behind him, while the doctor took the blood sample, was perhaps ludicrous, but certainly not clearly excessive nor illegal. (Cf. *People* v. *Dawson,* 127 Cal.App.2d 375 [273

P.2d 938].) Had the resistive drunk been placed on the bed, as intended, it seems likely his arms and legs would have to have been pinioned for the purposes of the doctor. There is no contention that the defendant was restrained upon the floor longer than necessary, and we have noted that the application of a tourniquet, the swabbing of the arm with an antiseptic, the insertion of the needle, and the withdrawal of the blood can be accomplished in from 15 to 45 seconds.

The court is not presented in this case with any parallel to *Rochin* v. *California,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396], where the concatenation of circumstances and the final force used was held to savor of the rack and the screw and to violate due process of law.

Reasonableness of the "search and seizure" is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of each case. (*Ker* v. *California,* 374 U.S. 23, 33 [10 L.Ed.2d 726, 737, 83 S.Ct. 1623].) The determination was made upon conflicting evidence. It must be considered in the light most favorable to the People to see whether it supports the determination of the trial court and the appellate department that the evidence was properly admissible over objection and that the judgment of conviction is supported by substantial evidence. (*Noto* v. *United States,* 367 U.S. 290, 296 [6 L.Ed.2d 836, 840, 81 S.Ct. 1517], cited in *Blefare* v. *United States,* 362 F.2d 870; *People* v. *Hills,* 30 Cal.2d 694, 701 [185 P.2d 11]; *People* v. *Hannon,* 44 Cal.App.2d 484 [112 P.2d 719].)

It would seem that the majority have disregarded such criteria. Conceding that the former declaration that blood samples could be taken "in the absence of force and violence" inaccurately states the law, the present decision reassesses the factual situation so as to reach essentially the same conclusion. In the language of *Schmerber* v. *California, supra,* the court cannot hold that the officers "responded to resistance with inappropriate force."

It is asserted that the majority opinion will advance the purposes of the testing process. The moral seems to be that if a drunk resists enough, his chances of "beating the rap" increase proportionately with his resistance, followed by his claim of the use of inappropriate force to subdue him.

It is true, of course, that the further a drunk progresses toward alcoholic oblivion, the less able he is to intelligently choose the method of testing to be employed. That he is incapable of rational choice or refusal does not withdraw the consent given as a requirement of the law. (Veh. Code, § 13353.) The tests may be given to any person covered by the statute, even if he be dead, unconscious or otherwise in a condition rendering him incapable of refusal. (*State* v. *Berg,* 76 Ariz. 96 [259 P.2d 261], forcible taking of breath sample; cf. *Blefare* v. *United States, supra,* 362 F.2d 870,

giving of emetic; consult generally cases cited in *People* v. *Conterno*, 170 Cal.App.2d Supp. 817, 827 [339 P.2d 968].)

If the majority had adopted the view that refusal to take the test at all was a fourth option under the statute, and that refusal in fact could negative the consent implied by law, support would be found in *Bush* v. *Bright*, 264 Cal.App.2d 788 [71 Cal.Rptr. 123].

The test in this instance revealed that appellant Kraft had .24 percent alcohol by weight in his blood. This was almost double that specified to mark the borderline.[1] It would be a miscarriage of justice to void his conviction.

Any claim that he unjustifiably was struck in the face en route to the hospital is not germane to the blood sampling itself. The officers admitted a blow, but the circumstances were not revealed. It is not presumed that it was not justified. If the circumstances were such that it was not, the fact that it was reprehensible does not void either the arrest or the detention. For any unjustified use of excess force, Kraft has his penal (*People* v. *Giles*, 70 Cal. App.2d Supp. 872 [161 P.2d 623]) and civil (*Stowell* v. *Evans*, 211 Cal. 565 [296 P. 278]) redress.

Therefore, I would affirm the judgment.

A petition for a rehearing was denied February 6, 1970. David, J. pro tem.,* was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied March 4, 1970. McComb, J., was of the opinion that the petition should be granted.

---

[1]Based upon the expert testimony developed on the subject, it is the presumption that anyone whose blood contains more than 0.15 percent by weight of alcohol is intoxicated. (Consider: *Lawrence* v. *City of Los Angeles*, 53 Cal.App.2d 6 [127 P.2d 931]; *People* v. *Tucker*, 88 Cal.App.2d 333 [198 P.2d 941]; *State* v. *Protokowicz*, 55 N.J. Super. 598 [151 A.2d 396, 398]; *State* v. *Childress*, 78 Ariz. 1 [274 P.2d 333, 46 A.L.R.2d 1169]; *Kay* v. *United States*, 255 F.2d 476, 481, cert. den. 358 U.S. 825 [3 L.Ed.2d 65, 79 S.Ct. 42]; *Toms* v. *State*, 95 Okla. Crim. 60 [239 P.2d 812].)

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.