[Crim. No. 4444. Second Dist., Div. Three. May 22, 1950.]

THE PEOPLE, Respondent, v. HOMER FLETCHER NEAL, Appellant.

Houser, Houser & Spence and J. Everett Houser for Appellant.

Fred N. Howser, Attorney General, and Gilbert Harelson, Deputy Attorney General, for Respondent.

VALLÉE, J.—The court, sitting without a jury, convicted the defendant of: Count 1. Attempt to murder Theodore R. Raymond. Count 2. Attempt to murder Myrtle Mae Raymond. Count 3. Arson. He was also accused of a prior conviction of burglary with respect to each count. He admitted the prior conviction. He was sentenced to state prison on each count, the sentences for attempt to murder to run consecutively, the sentence for arson to run concurrently with the others. Defendant appeals from the judgment.

The offenses were charged to have been committed about 4:15 a. m. on June 4, 1949. Theodore R. Raymond and Myrtle Mae Raymond were husband and wife. They had known defendant about 16 months and had lived in the same trailer court in Long Beach as defendant and his wife. On June 4,

1949, the Raymonds were living in a frame house in Long Beach. Defendant's wife and two children lived in the Raymond house with the Raymonds from May 16 to May 28, 1949. Defendant was confined in the county jail from December 30, 1948, to May 27, 1949.

On the night of June 4, 1949, Mr. and Mrs. Raymond occupied a bed in their home in a room with a screened window. The foot of the bed was near the window which was open. About 4:15 a. m. Raymond was awakened by a dog jumping on his chest, scratching and growling. He saw a flame coming through the window. In a moment the clothes of Mr. and Mrs. Raymond, her hair, the bed, and the interior of the bedroom were afire. Mr. and Mrs. Raymond were severely burned. He was in a hospital eight weeks; she, seven weeks.

The fire was of incendiary origin. Gasoline had been thrown through the window across the foot of the bed. The court could reasonably have inferred that a considerable amount of gasoline had been thrown through the window. The outside of the house was only slightly burned. The bedroom and the bed were badly burned. A garbage can which had been in the fire, containing a small amount of gasoline, was found on the ground about 10 feet from the bedroom window.

Shortly before the fire, during the time defendant was in the county jail, he wrote four letters to Raymond. The letters contained the following pertinent matters: Defendant advised Raymond to leave him and his family alone, that if he did not "I would make you sorry"; he called Raymond a "crook"; he indicated that there was some improper relation between Raymond and defendant's wife,—that they had conspired to put him in jail; he threatened to prosecute Raymond; he said that Raymond had tried to ruin his life, " [t]hat is one mistake you will pay for. By the time you get this letter, there will be two cooked geese, you and Ivy [defendant's wife], and maybe, Mert [Mrs. Raymond]"; he accused his wife and Raymond of having defrauded the county; he said Raymond had wrecked his home, saying "You have sure done me plenty dirty, Ted [Raymond]. You tried to help send me to San Quentin but that failed then you called the police and said that stuff under my trailer was stolen but it wasn't. You even turned Ivy against me"; he said that Raymond was sitting on a keg of dynamite and "Just think what I can do when I get out," and "If you [Raymond] think I am going to forget about what you have done to me, you are crazy."

Raymond testified that in December, 1948, at a time when

he and defendant were standing together as a police car driven by a police officer passed by, defendant said, "Five gallons of gas and a match would do that son of a bitch a lot of good." Mrs. Raymond testified substantially to the same effect. Another witness testified that in December, 1948, as he and defendant were driving past a police car parked alongside of a house, defendant said, "[T]here must be an officer lives there because there is a cruiser car sitting in the driveway, and he said what a man should do was take a can of gas and throw it on the house and strike a match and burn the house down."

Defendant was released from the county jail on May 27, 1949, and immediately went to Long Beach. His wife and children were living in the Raymond home at the time About 11:30 that night a rock was thrown through the bathroom window of the Raymond house and the air was let out of the tires of three automobiles parked outside of the house.

A witness testified that about 10 or 11 p. m. the night of June 3, 1949, in a bar in Long Beach, he had a conversation with defendant in which defendant said he was going to get even with somebody, to watch the headlines in the paper the next day. On June 5, after seeing a newspaper account of the fire at the Raymond house, the witness reported the conversation to the police. About October 10, 1949, defendant wrote a letter to this witness, threatening him if he testified against defendant. Raymond testified that about 12:20 a. m. on the night of June 3, 1949, he chased defendant out of his backyard.

On June 13, 1949, defendant was in Bakersfield. He knew the police were looking for him as a suspect in the Raymond case. He then changed his name to Robert Allen to conceal his identity and left for Northern California, finally arriving in Oakland. In Albany he bought an automobile and had the certificates and contract made out in the name of Robert Allen. He returned to Southern California about August 19, 1949. About midnight or after on the night of August 20, defendant went to the Raymond house. He was looking for the Raymonds. They were not in the house. At the time he had 5 gallons of gasoline in a can in his automobile. He was arrested at Torrance on August 21, driving the automobile. A 5-gallon can filled with gasoline was on the floor of the automobile at the time of the arrest. When asked why the car was registered in the name of Robert Allen, defendant said he did not want

to take any chances of being traced through the registration. On the way to the police station, defendant asked an officer, "How are the people?" At the police station he said the Raymonds "were a bad bunch"; that "he had had several run-ins with them and fights, and it was just a question of him or them."

The testimony of the defendant varied in a number of particulars from a statement he made to police officers and the district attorney after his arrest.

As grounds for reversal, defendant contends: 1. There was no substantial evidence to connect him with the crimes charged. 2. There was no proof of a specific intent to commit murder. 3. The court erred prejudicially in the admission of evidence. 4. The court erred prejudicially in receiving hearsay evidence in aggravation of punishment.

The evidence was sufficient to connect the defendant with the crimes charged. In contending that it was not, defendant argues the credibility of the witnesses and the weight of the evidence, matters with which we have no concern.

In contending that there was no proof of a specific intent to murder either Mr. Raymond or Mrs. Raymond, defendant assumes, but makes it plain that he does not admit, that he threw the gasoline and started the fire. ██ Where an attempt to commit a crime is charged, two important elements are essential to conviction: a specific intent to commit the crime, and a direct ineffectual act toward its commission. (*People* v. *Miller*, 2 Cal.2d 527, 530 [42 P.2d 308].) "Specific intent as an element of a crime may be proved by showing circumstances surrounding the act from which it may be inferred by the court as a trier of facts. Direct proof is not required but the circumstances must be such as would justify the court in inferring the intent with which the act was done. (*People* v. *Maciel*, 71 Cal.App. 213 [234 P. 877].)" (*People* v. *Rothrock*, 21 Cal.App.2d 116, 119 [68 P.2d 364].) ██ Defendant declared that: Raymond was going to pay for ruining his life and was going to be a "cooked" goose, and maybe Mrs. Raymond; Raymond was sitting on a keg of dynamite; "It was just a question of him [defendant] or them [the Raymonds]." The declarations of defendant, together with the circumstances surrounding the commission of the offenses, were sufficient to warrant the trial judge in concluding that defendant had a specific intent to murder Mr. and Mrs. Raymond.

██ The fact that the intent to murder may have been directed toward Mr. Raymond did not the less make the crime

complete as regards the charge of attempt to murder Mrs. Raymond. "[W]here one intends to assault or kill a certain person, and by mistake or inadvertence assaults or kills another in his stead, it is nevertheless a crime, and the intent is transferred from the party who was intended to the other." (*People* v. *Wells*, 145 Cal. 138, 140 [78 P. 470] ; *People* v. *Rothrock*, 21 Cal.App.2d 116, 119 [68 P.2d 364] ; *People* v. *Walker*, 76 Cal.App.2d 10, 15 [172 P.2d 380].)

Defendant contends the court erred in admitting in evidence over his objection: 1. The declarations of defendant made in December, 1948, to Raymond and another witness as to what could be done with 5 gallons of gasoline and a match. 2. The happenings on the night of May 27, 1949. 3. The declaration of defendant made on the night of June 3, 1949. 4. The testimony of Raymond that about 12:20 a. m. on the night of June 3, 1949, he chased defendant out of his backyard.

█ There was no error in admitting the items of evidence mentioned. The declarations as to what could be done with 5 gallons of gasoline and a match were relevant and material to show the state of mind of defendant. They were admissible to prove that he had an inclination to pyromania. His interest in gasoline and the use of it was a circumstance tending to identify him as the one who committed the crimes. (*People* v. *Adamson*, 27 Cal.2d 478, 485 [165 P.2d 3].)

█ The happenings on the night of May 27—the day defendant was released from jail and immediately went to Long Beach, his wife being at the Raymond home—were admissible as tending to prove continued hostility on the part of defendant toward the Raymonds. They constituted a logical link in the chain of evidence. The other items of evidence were manifestly admissible. █ The credibility of the witnesses, argued by defendant, was for the trial judge. The fact that the evidence, which defendant contends was erroneously admitted, may have tended to prejudice him in the minds of the jurors, is no ground for its exclusion. " 'The tendency of modern decisions is to admit any evidence which may have a tendency to illustrate or throw any light on the transaction in controversy, or give any weight in determining the issue, leaving the strength of such tendency or the amount of such weight to be determined by the jury ; and in determining the relevancy of evidence that may be offered upon an issue of fact much

depends upon the nature of the issue to sustain which or against which it is offered, and a wide discretion is left to the trial judge in determining whether it is admissible or not.' (*Moody* v. *Peirano*, 4 Cal.App. 411, 418 [88 P. 380].) This principle should apply *a fortiori* where the court sits without a jury." (*Estate of Ades*, 81 Cal.App.2d 334, 342 [184 P.2d 1].)

 Defendant, immediately after he was found guilty, waived time for pronouncing sentence. The court then made inquiry of defendant as to his history and habits and sentenced him to a state prison for the time prescribed by law on each count, whereupon the following occurred:

"[The court] Now I will hear from either or both counsel on the question of whether the sentences should run concurrently or consecutively. I will hear from the District Attorney first. . . .

"MR. STEN: [Deputy District Attorney] Your Honor has properly denominated this crime as a fiendish crime. . . . This defendant, in my opinion and from the investigation of this case and the developments of it and the hearing of the testimony here in court, is a dangerous man of definite criminal tendencies. He has a long police record going back to the time he was a juvenile, when he was made a ward of the Court for stealing a car, for molesting a four year old child, for stealing a bicycle, and for other crimes. He was also arrested on a 288 charge upon which no complaint was filed; so that might be ignored. He entered a plea of guilty to the crime of grand theft, a felony, in 1937 or '38. In any event, it doesn't matter as to the date. There was a plea of guilty entered to the crime of grand theft, a felony, when this defendant was nineteen years old, and he was dealt with at that time as a juvenile. . . . Subsequently in 1939, approximately, the defendant was arrested virtually in the act of snatching a purse from a lady by the name of Mrs. Haight at 1100 Cedar Avenue in Long Beach in the nighttime, and in the commission of that offense the defendant knocked this woman down and grabbed her purse and was approximately ten or fifteen feet away from her at the time he was apprehended by Police Officers Wiggins and Grant. In that case he was tried by Judge Desmond, as I recall, and he was found guilty of the charge of robbery. There was also a plea of not guilty by reason of insanity interposed in the case. Two alienists appointed by the Court found the defendant, upon his own statements and those of his relatives, to be insane, and one alienist found him to be sane. Judge

Desmond found, by virtue of the findings of the alienists, that the defendant was not guilty of the crime by reason of insanity, and at that time he was sentenced to Mendocino. Three months later or approximately four months later the defendant sued out a writ of habeas corpus in Mendocino County and there took the witness stand and testified that his statements to the alienists were strictly false, fictitious, and fraudulent, and that he had perpetrated a fraud on the Court and upon the alienists, and that he was not insane at the time that he entered such a plea, and that he was not insane or crazy at the time he committed the offense and that he had misled the alienists by telling them a bunch of facts that were not true, and that he tried suicide in the County Jail pending the matter of the trial of the case on the robbery, and he also stated that it was only a feigned attempt for the purpose of further fooling the alienists. The writ of habeas corpus was granted because the doctors up there found he was not insane, and he was sent back here for further proceedings. Of course, nothing could be done on that robbery conviction because there had been a finding and a judgment of the Court. However, his probation was revoked on the previous burglary offense [the prior conviction charged in the information here], and he was sentenced to San Quentin.

"Subsequently he did one hundred and twenty days for contributing or molesting a child, as I recall. The offense that he was sentenced on in February of 1949, this year, and upon which he was arrested on December 30, 1949 [1948?], was petty theft with a prior, involving the stealing of some pipe metal belonging to the City of Long Beach, I believe. He was given a one hundred and twenty day sentence upon that, and then he got out and committed this offense. There are a considerable number of other arrests, petty thefts, which I haven't gone into.

"I have taken your Honor's time for this one purpose: I believe that this defendant should be kept in prison a long time. I believe that when he gets out of prison, which he will some day, he will go right back into leading a criminal life. I believe further that if and when he gets out of prison, some harm will come to some of the persons that testified in this case if he can find them. I therefore ask the Court to consider running at least two of these counts consecutively to assure a more extended term in the penitentiary." Defendant, on

cross-examination, had admitted the conviction of theft of an automobile when he was a juvenile.

The attorney for the defendant then stated that he knew nothing about some of the matters stated by the district attorney, and argued that the sentences should run concurrently. The court then ordered that the sentences for attempt to murder run consecutively and that the sentence for arson run concurrently with the other two.

The court was required to direct whether the sentences should run concurrently or consecutively. (Pen. Code, § 669.) In this state the statute prescribes the rules of evidence applicable to the manner in which a judge may obtain information to guide him in the imposition of sentence upon an already convicted defendant. Penal Code section 1204 prescribes the evidence that may be received in aggravation or mitigation of the punishment to be imposed. It provides: ''The circumstances must be presented by the testimony of witnesses examined in open court, . . . No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section.''

Section 1204 requires the court in determining the consequences of guilt to receive *evidence* either in mitigation or aggravation of the punishment to be imposed. ''To this end any testimony bearing upon the character or the antecedents of the convicted person—whether he has theretofore been of good or bad character or borne a good or bad reputation or been previously convicted of some offense against the law— may be presented to the court.'' (*People* v. *Rudolph,* 28 Cal. App. 683, 685 [153 P. 721].) The section expressly condemns the practice followed in the present case. (*People* v. *Giles,* 70 Cal.App.2d Supp. 872, 879 [161 P.2d 623].)

The defendant has a right to be present when judgment is pronounced against him, and he has a right to be confronted with the witnesses who have accusations to make against him. (Pen. Code, § 1193; *People* v. *Giles, supra,* p. 882.) The statement of the district attorney, wholly unsupported by any evidence, was highly inflammatory and prejudicial. If any of the matters referred to by the district attorney was true, it should have been presented to the court in the form of evidence. The statute demands that the duty

of determining the question of aggravation or mitigation of punishment be performed with scrupulous fairness to the defendant. The fact that the defendant here had been convicted of "a fiendish crime" did not justify departure from the command of the statute. The comment of the Supreme Court of Pennsylvania in *Commonwealth* v. *Johnson*, 348 Pa. 349 [35 A.2d 312], is particularly pertinent, pp. 313, 314 [35 A.2d]: "It is a prisoner's constitutional right in this Commonwealth 'to meet the witnesses face to face' (Sec. 9, Declaration of Rights Const. P.S.). In *Com.* v. *Corsino*, 261 Pa. 593 at page 598 [104 A. 739, 740], we held: 'It is the inherent right of the prisoner in a capital case to be present at every stage of the proceedings from the arraignment to the rendition of the verdict. Neither court nor judge can take any step affecting his right in his absence.'. . . . A judge whose duty it is to determine the proper sentence imposed on those convicted of crime cannot be expected to limit himself to only that which appears in the record of the trial of the prisoner. It is to the benefit of society and it may be of benefit to the prisoner, to have the sentencing judge consider facts other than those adduced at the trial. Such facts might militate in a prisoner's favor or they might militate against him. However, when a judge is faced with the duty of determining whether or not a convicted murderer is to be sentenced to death or life imprisonment the seriousness of the problem is such that a judge who is possessed of that zeal to do justice which characterizes the just judge, will as far as is practicable, give the defendant an opportunity to confront the witnesses against him and to offer evidence in his own behalf. Such a procedure if followed will be informative to the understanding and enlightening to the judgment, of the sentencing tribunal."

A separate judgment was entered on each count. The judgment ordering that defendant be punished for attempt to murder Myrtle Mae Raymond as charged in count 2 of the information, insofar as it directs that the sentence ordered run consecutively with the sentence imposed as to count 1 (attempt to murder Theodore R. Raymond), is reversed. The superior court is directed to proceed anew to determine whether the sentence imposed as to count 2 shall run concurrently or consecutively with the sentences as to counts 1 and 3, and to receive such legal evidence only as may be offered by either party with respect thereto. In all other respects said judg-

ment is affirmed. The judgments for attempted murder of Theodore R. Raymond and for arson are, and each is, affirmed.

Shinn, P. J., concurred.

WOOD, J.—I cannot agree that the trial judge committed prejudicial error in ordering that the sentences for attempted murder run consecutively.

Immediately after the arguments in the case the trial judge proceeded to make comments preliminary to announcing his decision. Among other things, he said: "This is the most fiendish, the most brutal, the most vicious crime that has ever come to the attention of this Court, and as a result of the acts of this man Mrs. Raymond is going to be a helpless cripple the rest of her life." Then the judge stated that he found the defendant guilty on each of the three counts. The defendant waived time for pronouncing sentence. The deputy district attorney requested permission to address the court upon the subject of concurrent and consecutive sentences. The judge replied, "Very well." Then he sentenced the defendant on each count to imprisonment in the penitentiary for the term prescribed by law. Then the deputy made the remarks stated in the above opinion. No objection was made by defendant to the statement of the deputy, and no motion was made to strike out any part of the statement. At the time of ordering that the sentences run consecutively the judge made no statement indicating that his order was based upon anything the deputy had said. In 15 American Jurisprudence 168 it was said: "It is presumed that the court in inquiring as to circumstances of aggravation or mitigation disregards all incompetent evidence." In *The People* v. *Popescue,* 345 Ill. 142, it was said at pages 155-156 [177 N.E. 739, 77 A.L.R. 1199]: "In the case at bar the written order of the judge sentencing the two defendants to die in the electric chair made no reference to any crime other than the crime charged. . . . The order therefore fails to show that the judge abused his discretion in any regard. In such case the presumption of regularity must obtain. Even if it should be assumed that the evidence of the murder committed by these defendants three hours before they murdered Merrill was incompetent, this was a hearing before the court without a jury, and the court is supposed, as in chancery cases, to disregard all evidence heard except that which is competent and relevant to the issue."

In view of the fact that, prior to the statement of the deputy,

the judge had said that the crime was the most fiendish, the most brutal, and the most vicious one which had ever come to his attention and that the defendant had crippled Mrs. Raymond for life, and in view of the fact that it was shown during the trial that defendant had been convicted twice previously, it is practically certain that, irrespective of the statements of the deputy, the judge would have ordered that the sentences run consecutively. Concurrent sentences were not indicated by the evidence. Defendant designedly planned to murder two persons by fiery torture. He maimed and tortured them mercilessly. It is clear there was no miscarriage of justice. In my opinion the error of the deputy district attorney was not prejudicial and the judgments should be affirmed.