Filed 2/25/25  P. v. Slayton CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CODI JOHN SLAYTON,<br><br>Defendant and Appellant. | F087006<br><br>(Super. Ct. No. MCR065238)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Codi John Slayton, who was 19 years old at the time of the offense, pleaded guilty to the second degree murder of 16-year-old Josephine Jimenez (Pen. Code, § 187, subd. (a)),[1] and, as part of his plea agreement, stipulated to lifetime sexual-offender registration under section 290.  At a sentencing hearing, the trial court imposed the stipulated sentence of 15 years to life and ordered lifetime registration under section 290.  Immediately after sentencing, the court conducted a *Franklin*[2] proceeding, and accepted documentary submissions from defendant and the prosecution.

Defendant submitted a written psychological assessment conducted by clinical psychologist Timothy Beach, Psy.D., and the prosecution submitted a brief summarizing the law enforcement investigative findings of uncharged acts committed by defendant that had close temporal proximity to Jimenez's murder.  These acts indicated a pattern of sexual exploitation of young girls and women, which the court had previously ruled were admissible at trial under Evidence Code sections 1108 and 1101, subdivision (b), to prove the prosecutor's theory of the case—that Jimenez's murder was not an accident, and was committed during the course of Jimenez's rape.

Defense counsel objected to submission of the prosecutor's brief, arguing the prior-acts findings were not all relevant to rebut Dr. Beach's evaluation, and the brief should not be accepted wholesale for purposes of the *Franklin* proceeding.  On appeal, defendant argues only *evidence* may be submitted at a *Franklin* proceeding conducted under section 1204 and California Rules of Court, rule 4.437, and asserts an argumentative brief drafted by the prosecutor is not *evidence* within the meaning of these authorities.

---

[1]    All further statutory references are to the Penal Code unless indicated otherwise.

[2]    *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

2.

We affirm the trial court's ruling: defendant's claim was not adequately preserved below, but even considering the merits, we find no prejudicial abuse of discretion in accepting the brief as part of the postjudgment proceedings.

## FACTUAL BACKGROUND

### I. Jimenez's Murder[3]

Jimenez, a 16-year-old high school student who lived at home with her parents, was reported missing on October 14, 2019. Her father reported he had gone to wake his daughter for school, and when he walked into her room and discovered she was not there, he contacted law enforcement. On October 22, 2019, the body of an unidentified female was discovered half buried in an orchard; an autopsy revealed it was Jimenez.

At the time of Jimenez's murder, defendant—who was originally from Madera— was an active-duty marine stationed at Camp Pendleton near San Diego. By December 2019, defendant was under investigation by the Naval Criminal Investigative Services (NCIS) for uploading to the internet nude photographs and video of a different woman without her consent. During an interview with NCIS agents about these acts, defendant stated that he had exchanged nude photographs with Jimenez, and he told them she had been recently found deceased.

NCIS agents then contacted the Madera County Sheriff's Department, and county law enforcement traveled to San Diego and interviewed defendant at Camp Pendleton in connection with Jimenez's murder. Defendant told the sheriff's detectives the last time he had seen Jimenez was on the night she disappeared; he had picked her up to get something to eat, but they changed their minds. He said she wanted to have sex, so he parked his vehicle near some vineyards, and they had sex. He told investigators he then

---

**3** The background section is largely taken from the probation report and is set forth only to provide a factual context.

3.

drove her back to her neighborhood, and she walked back to her house; he drove back to Camp Pendleton and went to work the next day. He denied killing her.

In another interview the following day, defendant told them Jimenez had wanted to have rough sex, and he had obliged; as part of that, he had "choked" her during sex and he felt something pop in her neck; he let go, but it was too late. He had not wanted to "choke" her, but she seemed irritated when he refused, so he agreed. After he realized she was dead, he drove back toward her house, but changed his mind and drove Jimenez's body out to a field and tried to bury her. He then went back to Camp Pendleton. His sister later told him that Jimenez's body had been found, and he attended her funeral service as he felt that he owed it to her to be there. He said what he had done was weighing on him, and he appeared to the detectives to be visibly upset. After the interview, he was arrested for Jimenez's murder and transported back to Madera County for prosecution. Defendant was charged with one count of murder.

During the investigation into Jimenez's murder, evidence was uncovered suggesting defendant was forcing several women and teenage girls to send him nude photographs and videos of themselves, and there was evidence that suggested he was also exploiting Jimenez in this way. Based on this evidence, the prosecution was pursuing a theory that the sexual encounter Jimenez and defendant had on the night she died was not consensual, and that Jimenez's death was not an accident as defendant was claiming.

## II.    Procedural Background

As the case progressed toward trial, the prosecution sought an in limine ruling to admit evidence of defendant's prior uncharged acts to show his predisposition to commit sexual offenses (Evid. Code, § 1108) and to establish a motive, plan or scheme indicating a lack of accident or mistake in killing Jimenez (Evid. Code, § 1101, subd. (b)). Below is an abbreviated summary of the evidence that was collected during the investigation and described in the prosecutor's brief.

4.

### A.    Prior-acts Evidence

#### 1.    Emily

Defendant and Emily dated and had a sexual relationship. Emily indicated that defendant was forceful and aggressive when they engaged in sex. Absent her consent or request, defendant had "choked" her during sex. On multiple occasions, he had forced her to have sex with him even after she refused or told him to stop. He would also slap her buttocks during sex; she had told defendant not to hit her and he had stopped for a while, but resumed doing so on a later occasion. During one sexual encounter, he had shoved her face into the bed and into the wall, and, while doing so, he forcefully held her arms behind her back. She described him as aggressive and manipulative during sex.

When they had sex for the first time, he had forced his hand down her pants after she refused his advances, then pushed her onto the bed, pulled down her pants, and proceeded to penetrate her. At some later time, on threats of harm and rape to her and her family, an anonymous person instructed Emily to have sex with multiple strangers in their cars near her house in Madera, and she was instructed to videotape the encounters and send the videos to an anonymous account. The accounts were later linked to defendant.

Even after Emily began attending college out of the state, this anonymous person continued to send her threatening messages telling her to record herself engaging in various sexual acts or send nude photographs of herself to various accounts. Many of the accounts sending these threats and communications were linked to defendant. Without her permission, she also discovered someone had uploaded nude pictures of her to a pornographic website, along with a video of defendant and her having consensual sex. She discovered the video online when someone sent her a link to it via social media. The video identified her social media account and where she was attending college at the time.

The threats and harassment finally stopped after Emily reported them to a local county sheriff where she was attending college in October 2019. She also reported

money was fraudulently wired from her account to defendant, and she disclosed the sex video of her that had been uploaded to the pornographic website. She reported a message from an anonymous Instagram account that had asked her to make another sex recording.

In a subsequent interview with federal investigators, defendant admitted to pressuring Emily into sending him nude photographs, and analysis of his cell phone showed defendant's various online accounts matched those that had been used to threaten and harass Emily.

### 2. Gianna

Gianna told investigators she had provided topless photographs to defendant when she was 13 and 14 years old, and that defendant had known her age at that time. Defendant had sent her a picture of his penis. Gianna then began receiving harassing messages from unknown numbers in 2018 and in September 2019. The emails, which investigators found, threatened to expose her topless photograph to her boyfriend, friends, and teachers, and that it would be posted on a pornographic website. One email, traced to an IP address located at Camp Pendleton, was dated October 15, 2019, two days after Jimenez was killed.

### 3. Julia

Investigators also interviewed Julia, who had a sexual relationship with defendant in 2017. She described defendant as forceful and aggressive during sex: he would shove her head into the pillow, he would grab her by the hair as he forced her to have oral sex with him, and he had forced her to engage in anal sex despite her refusal and demands that he stop. She denied that he tried to "choke" her during sex, but defendant told investigators that he had choked Julia a little.

Julia had also received messages from random numbers asking for nude photographs, and the messages included nude photographs of herself that she had sent to defendant while they were dating. The messages stopped when her mother contacted defendant and told him they had reported the messages to the police.

6.

### 4. Cali

Cali was also interviewed by investigators. She had sent nude photographs to defendant and later received anonymous messages threatening to expose the pictures if she did not send more sexual photographs. She was also informed the person knew where she lived and would come after her. She reported the harassment to the local police department in June 2019, and she disclosed it to investigators working on Jimenez's case. She told investigators the pictures she had sent to defendant were uploaded to a pornographic website. When she stopped sending nude photographs of herself, one of the photos was sent to a male acquaintance of hers. Several of the online accounts threatening Cali were later linked to defendant.

Cali had sex with defendant in July 2019, and she described him as wanting to be in charge during sex and liking sex rough. She said he was not gentle nor "'fully choking you,'" but something in the middle. He had pulled her hair and slapped her during their sexual encounter, but they had discussed doing these things ahead of time. At that time, she thought defendant was not involved in the anonymous messages she was receiving.

### 5. Crystal

Crystal and defendant had traded phone numbers; in June 2019, she started getting messages from an unknown number requesting nude photographs. She refused to comply, and she began receiving threats from the number that the person was coming after her, her friends and her family. One of the phone numbers from which she received threats was the same number that had sent threats to Emily.

### 6. Alicia

Alicia described to investigators that she had sent sexually explicit photographs to her boyfriend; after breaking up with him, she started receiving threats and requests for nude photographs. She was informed that if she refused, the photographs she had originally sent her boyfriend would be exposed to her family and friends. Investigators found communications between Alica's ex-boyfriend and an account belonging to

7.

defendant; the account associated with defendant had sent a message to Alicia's ex-boyfriend seeking her photographs.

### 7. Female Marines

In October 2019, two female marines who resided in the same building as defendant reported their bags containing personal belongings had been stolen from their room. One of the marines then began receiving messages requesting nude photographs in exchange for the return of her stolen belongings. One of the marines also reported a note had been stuck on her door threatening that if she reported anything, she would not get her things back. When she communicated with the phone number listed on the note, she received demands to send sexual photographs of herself or to meet for sex; if she refused to select one of those options, the person threatened to sell her Social Security card and birth certificate. The bags containing the personal belongings of these marines were found in defendant's vehicle.

### 8. Other Evidence

The brief also described video of Jimenez found on one of defendant's laptops, that nude photographs of Jimenez were found in an email account associated with defendant, along with a Snapchat account that had been used to request explicit photos from Emily. One video of Jimenez found on defendant's laptop showed her posing and turning around nude in front of a restroom mirror; the prosecutor's theory was that Jimenez appeared unhappy about making the video and that she was being exploited just like the evidence indicating defendant exploited other women and teenage girls. Three accounts associated with a pornography site were found on defendant's cell phone; social media information showed defendant was communicating with women and trying to meet with some of them to have sex in the days just before Jimenez was killed, and other similar communication three days after Jimenez's death.

The brief explained the prosecutor's theory of the crime based on the evidence: that defendant was exploiting Jimenez like the other women and girls, the sexual encounter was not consensual, and Jimenez's death was not an accident.

**B.     Trial Court's Pretrial Ruling on Admissibility of Prior-acts Evidence**

On May 23, 2023, the trial court granted the prosecution's request to present this prior-acts evidence at trial, with three exceptions. The court excluded (1) evidence that defendant forced Emily to have sex with five strange men; (2) evidence that defendant had attempted to secure the services of a hacker; and (3) evidence that defendant had received emails from Frontwave Credit Union advising him of money transfers to his account from Emily's account.

**C.     Defendant's Plea and Sentencing**

After the rulings on the in limine motions, defendant pleaded guilty to second degree murder, and the parties stipulated to a sentence of 15 years to life. The parties' plea agreement also required defendant to register as a sex offender under section 290 for his lifetime.

A sentencing hearing was held on September 26, 2023, and the trial court imposed the stipulated sentence of 15 years to life, along with various fines and fees, and ordered defendant's lifetime registration under section 290. Immediately following the sentencing, *Franklin* proceedings were held to preserve information for an eventual youth offender parole hearing under section 3051.

To that end, defense counsel submitted a psychological assessment of defendant performed by Timothy Beach, Psy.D. The prosecutor requested the court accept his brief, filed in December 2021, seeking to admit the prior-acts evidence at trial, arguing the brief could be submitted as part of the *Franklin* proceedings. The court indicated the brief would go into the prison packet for reference at any future parole hearing.

Defense counsel objected to the admission of the prosecutor's brief, and argued not every prior act identified in the brief actually rebutted the psychological evaluation.

9.

Had the prosecutor wanted to establish the relevance of this evidence, defense counsel asserted, he could have called the psychologist to testify, confronted him with those prior acts and the court could have ruled on its relevance. The prosecution argued the prior-acts evidence was relevant and provides insight into what was "going on" with defendant at the time he committed this murder.

The trial court granted the prosecutor's request to submit the brief, and ordered the transcript of May 23, 2023, be prepared, which provided the trial court's ruling regarding the admissibility of the prior-acts evidence described in the prosecution's motion in limine brief filed in December 2021. The court ordered that it be submitted along with the prosecutor's brief as part of the prison packet.

The People maintain defendant forfeited this claim of error by failing to make an objection on this specific ground at the *Franklin* proceeding. On the merits, the People contend the brief was properly offered as a statement of view under section 1203.01. The People contend that, as explained in *In re Cook* (2019) 7 Cal.5th 439 (*Cook*), section 1203.01 provides a procedural vehicle to augment the record with *Franklin*-proceeding materials. Relying on *People v. Ferenz* (2024) 99 Cal.App.5th 1032 (*Ferenz*), the People argue section 1203.01 permits a prosecutor to attach materials like police reports, investigative reports and interview transcripts to a statement of view, despite that those materials may relate to uncharged conduct, dismissed counts, unsubstantiated allegations, or include hearsay. Thus, section 1203.01 encompasses the prosecutor's brief in this case, which summarizes prior-acts evidence of defendant gathered by law enforcement in the course of investigating Jimenez's death.

A.     **Forfeiture**

A party on appeal may forfeit a contention, even one concerning a constitutional right, by failing to raise it in the trial court. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881; see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1357 [timely and specific objection is required to preserve an issue for appeal].) " " " "The law casts upon the party the duty of

10.

looking after his legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.'"'" (*People v. Saunders* (1993) 5 Cal.4th 580, 590.)

When the prosecutor sought to submit the prior-acts brief during the *Franklin* proceeding after sentencing, defense counsel objected as follows:

> "Judge, just for the record, I object to that coming into evidence, because I—Number 1, my position is that not everyone—not every [Evidence Code section ]1108 rebuts what is alleged in the—in the doctor's report, for one. For two, it—if—I believe—[the prosecutor] was—we spoke about it, and I said, 'I'm going to submit this.'  Had he wanted my psychiatrist to testify, he could—he could have confronted my psychiatrist with that information, then the Court could rule on what the admissibility or relevance of it or the impact it had.  To simply say, because—to me, it obfuscates the purpose of the Franklin hearing.  The legislature has indicated that, for whatever reason, individuals younger than 26 years old are different—or 23 years old, I'm sorry—are different.  [¶]  And the legislature is asking for the Court to acknowledge or a parole board in the future to acknowledge any relationship between the crimes and—for example, my client's youth or what happened in his background.  I know what the … [Evidence Code section] 1108 is, and I also know what—what the doctor opined, and I don't think that it is so simple to just let everything in.  I'm not sure that all of those rebut, so to speak, what the doctor is saying.  So…"

Defense counsel's objection was not that the brief was not evidence permissible under section 1204 or rule 4.437 of the California Rules of Court to be received as part of a *Franklin* proceeding.  The objection was aimed instead at the relevance of the prior-acts evidence to rebut the psychiatrist's evaluation, which defense counsel asserted could have been assessed by calling the psychiatrist to testify and confronting him with that information.  This was not adequate to preserve the claim defendant now makes on appeal.

The reason for the forfeiture rule is "'that "[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." [Citations.] "[T]he forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error." [Citation.]' (*People v. French* (2008) 43 Cal.4th 36, 46.)" (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1101.) Had the objection been made on the ground the brief was not evidence and could not be submitted under section 1204 or California Rules of Court, rule 4.437, the court and the prosecutor could have considered the issue and whether, perhaps, live testimony or other documentary evidence was required.

### B. No Prejudicial Abuse of Discretion in Accepting the Brief at the *Franklin* Proceeding

Nevertheless, even if we were to overlook the forfeiture and address the merits of the claim, we find no prejudicial abuse of discretion.

The proceeding outlined in *Franklin* "derives from the statutory provisions of sections 3051 and 4801." (*Cook, supra*, 7 Cal.5th at p. 459.) It is "unrelated to the validity of the defendant's sentence" (*id.* at p. 451), and its purpose "is not to influence the trial court's discretionary sentencing decisions but to preserve information relevant to the defendant's eventual youth offender parole hearing" (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 300, citing *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1131).

The trial court "may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence." (*Franklin, supra*, 63 Cal.4th at p. 284.) The defendant may place on the record "any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile

offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*Ibid.*)

The trial court may "exercise its discretion to conduct this process efficiently, ensuring that the information introduced is relevant, noncumulative, and otherwise in accord with the governing rules, statutes, and regulations." (*People v. Rodriguez, supra*, 4 Cal.5th at p. 1132; accord, *Cook, supra*, 7 Cal.5th at p. 459.) "The [trial] court may, for example, require an offer of proof regarding the evidence the offender seeks to present, so that it can determine whether such evidence is relevant to youth-related factors and meaningfully adds to the already available record. It may also determine whether testimony is 'appropriate' [citation], or if other types of evidentiary submissions will suffice." (*Cook, supra*, at p. 459.)

Defendant points out that section 1204 presents a strong preference for evidence in the form of live testimony. In relevant part, section 1204 provides, "The circumstances shall be presented by the testimony of witnesses examined in open court, except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a magistrate of the county, out of court, upon such notice to the adverse party as the court may direct. No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section.…" Defendant also notes that California Rules of Court, rule 4.437(d) requires that any "[a]ssertions of fact in a statement in aggravation or mitigation must be disregarded unless they are supported by the record in the case, the probation officer's report or other reports properly filed in the case, or other competent evidence."

Relying on three cases regarding sentencing hearings and the scope of what may be submitted under section 1204, defendant contends that an argumentative recitation of facts contained in the prosecutor's Evidence Code section 1108 brief is not *evidence* within the meaning of section 1204, and the prosecutor should not have been permitted to

13.

submit it. In *People v. Neal* (1950) 97 Cal.App.2d 668, the court held it was error under section 1204 to permit the prosecutor to relay evidence of prior crimes through argument at the sentencing hearing. (*Neal, supra*, at p. 677.) The court explained the statement of the district attorney was wholly unsupported by any *evidence*; had any of those matters been true, section 1204 required that they be presented to the court in the form of evidence that the defendant could have confronted. (*Neal, supra*, at pp. 676–677.)

Similarly, in *In re Calhoun* (1976) 17 Cal.3d 75, a prosecutor submitted an ex parte letter to the court prior to sentencing stating the prosecutor's personal observations and opinion about the evidence in the case to assist the court in determining whether to impose consecutive sentencing. (*Id.* at pp. 83–84.) The high court held these extrajudicial statements provided no opportunity for the defendant to respond. Allowing a judge to receive information outside the record for purposes of determining whether to impose consecutive sentences would undermine the purpose of ensuring an adversarial procedure at sentencing. (*Id.* at pp. 84–85.) Finally, in *People v. Hernandez* (1984) 160 Cal.App.3d 725, the court reiterated that the information a court may receive at a sentencing hearing under section 1204 is "evidence which means, in essence, facts." (*Hernandez, supra*, at p. 741.)

We agree that an attorney's written summary of evidence gathered by law enforcement during a murder investigation is not *itself* admissible evidence, but it described and identified *evidence* gathered during the investigation that could have been presented in an admissible form. That is also true of the psychologist's evaluation defendant submitted—when offered for the truth of a matter asserted, the evaluation document itself is an out-of-court statement that constitutes hearsay and contains multiple layers of out-of-court statements. Neither document presents evidence in an admissible form, but the trial court has discretion to determine whether testimony is necessary or whether other types of submissions will suffice in a *Franklin* proceeding. (*Cook, supra*, 7 Cal.5th at p. 459.)

14.

The prior-acts evidence described in the brief is relevant to consider whether or to what degree defendant's murder of Jimenez was influenced by youth-related factors. The evidence could be viewed as a pattern of behavior very close in temporal proximity to the crime and could suggest Jimenez's murder was less the product of youthful poor judgment during sexual experimentation, which ended tragically (as defendant indicated to investigators), and more the product of an intentional pattern of behavior that culminated in Jimenez's nonaccidental death. It also could be viewed as suggesting a pattern of conduct with teenage girls and women, some of whom defendant had no personal relationship, that contradicted Dr. Beach's view that defendant's behavior with Jimenez was the product of a fear of abandonment by someone he loved coupled with isolation, caffeine addiction and sleep deprivation he experienced in the military. The prior-acts evidence provides important context for the crime's occurrence, it speaks to defendant's culpability, and it offers some insight into the degree to which youth-related factors may have impacted defendant's conduct. (*Cook,* 7 Cal.5th at p. 450 [prosecutor "'may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors'"].)

Moreover, even if the brief itself cannot be considered *evidence* for purposes of section 1204, the brief could nonetheless have been accepted by the trial court and forwarded to CDCR as a statement of view under section 1203.01. As noted in *Cook*, section 1203.01 provides, "Immediately after judgment has been pronounced, the judge and the district attorney, respectively, may cause to be filed with the clerk of the court a brief statement of their views respecting the person convicted or sentenced and the crime committed, together with any reports the probation officer may have filed relative to the prisoner." (*Id.*, subd. (a).) The same section also provides, "The attorney for the defendant and the law enforcement agency that investigated the case may likewise file with the clerk of court statements of their views respecting the defendant and the crime of

15.

which they were convicted." (*Ibid.*) The purpose of section 1203.01 is to "create a postjudgment record for the benefit of [CDCR]." (*Cook, supra,* 7 Cal.5th at p. 452.) Unlike *Cook*, section 1203.01 was unnecessary in this case to provide a procedural mechanism to hold a *Franklin* proceeding, but the statute remains an avenue for the prosecution to submit to CDCR its own view of defendant and defendant's offenses.

As the prosecutor's brief explained, the summarized evidence, which included prior acts by defendant, shaped the prosecutor's theory that Jimenez's death was not accidental as defendant claimed in his statements to investigators, and that it constituted first degree murder during the course of nonconsensual sexual activity; additionally, it provided context for the lifetime sex offender registration under section 290 stipulated as part of the plea agreement, despite that no sex offense was charged in the case. As such, even if the brief was not itself evidence that could be submitted under section 1204 and California Rules of Court, rule 4.437, it nevertheless could have been accepted by the trial court and submitted to the CDCR as a statement of the prosecutor's view of the crime under section 1201.03. (See *Ferenz, supra*, 99 Cal.App.5th at pp. 1042–1043, 1045–1046 [prosecutor's statement of view submitted under § 1203.01 was not beyond the scope of § 1203.01 even though it included statements and exhibits related to uncharged conduct and dismissed counts].)

In *Ferenz*, the trial court accepted a postjudgment statement of view from the prosecutor pursuant to section 1203.01 with 16 attached exhibits, including police reports, district attorney investigative reports, interview transcripts, preliminary hearing transcripts and records of the defendant's prior convictions. (*Ferenz, supra*, 99 Cal.App.5th at p. 1042.) The defendant argued it went well beyond the scope of the crime committed because it included statements and exhibits related to uncharged conduct, dismissed counts, or allegations that were not substantiated. (*Id*. at p. 1043.) The appellate court rejected the argument on appeal, reasoning there was nothing under section 1203.01 that precluded a prosecutor from attaching reports, transcripts or other

16.

documents, and, as explained in *Cook*, the court had inherent authority to augment the record with material pertaining to the defendant and his offense. (*Ferenz, supra*, at pp. 1045–1047.) While *Ferenz* did not involve a *Franklin* proceeding, the opinion explains why the prior-acts evidence described in the prosecutor's brief here was the type of information that could be included in a postjudgment statement of view under section 1203.01.

There is no specific form a section 1203.01 statement of view is required to take, and the prosecutor's brief describing the prior-acts evidence and its relevance to the current offense clearly relates to the crime committed and the prosecutor's theory of *how* it was committed. (*Id.*, subd. (a).) It was also submitted immediately postjudgment as section 1203.01 anticipates. Because the brief could have been accepted and forwarded to CDCR as the prosecutor's statement of view under section 1203.01, defendant has not demonstrated any prejudicial error. (Cf. *People v. Brooks* (2017) 3 Cal.5th 1, 39 [appellate court reviews the ruling, not the trial court's reasoning, and, if the ruling is correct on any ground, the reviewing court affirms].)

Finally, whether the Board will consider the brief at any parole hearing is not yet known. In determining suitability for parole, section 2402 of title 15 of the California Code of Regulations provides the Board of Parole hearings must consider "[a]ll relevant, reliable information …." (*Id.*, subd. (b); see *In re Shaputis* (2011) 53 Cal.4th 192, 218.) Such information may include the prisoner's involvement in other criminal misconduct "which is reliably documented …." (Cal. Code. Regs., tit. 15, § 2402, subd. (b).) "At least 10 days before any hearing by the Board of Parole Hearings, the inmate shall be permitted to review the file which will be examined by the board and shall have the opportunity to enter a written response to any material contained in the file." (§ 3041.5, subd. (a)(1).) At the time for parole consideration, defendant remains free to argue the brief is not reliable because, for example, it constitutes multiple layers of hearsay if

considered for the truth of any matter asserted, and is not supported by the actual investigative reports from which the brief was gleaned or any live testimony of witnesses.

## DISPOSITION

The court's determination to accept the prosecutor's brief at a postjudgment *Franklin* proceeding is affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.